FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 AUG 28 PM 1:06

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RAYMOND ATKINS, #330632** | * | |
| **Plaintiff,** | | |
| **v.** | * | **CIVIL ACTION NO. PWG-14-3312** |
| **MARYLAND DIVISION OF** | * | |
| **CORRECTION** | | |
| **KATHLEEN GREEN (WARDEN)** | * | |
| **NORMAN HANCOCK (CHAPLAIN)** | | |
| **Defendants.** | * | |

*****

## MEMORANDUM

Petitioner Raymond Atkins is an inmate in the Maryland correctional system and has filed claims asserting that Defendants denied his right to exercise his religion and violated his rights to due process under the Fourteenth Amendment when he was denied a kosher diet for a 29-month period. Compl., ECF No. 1. Atkins has filed two motions to appoint counsel, ECF Nos. 2 and 11, sought summary judgment, ECF No. 17, and filed a request for entry of default, ECF No. 21. Defendants have filed a motion to dismiss or, in the alternative, motion for summary judgment, ECF No. 18, which Plaintiff has opposed, ECF No. 22.[1]

Because I find that the only claims that may proceed are Atkins's § 1983 First Amendment claim against Chaplain Norman Hancock and Atkins's claim for statutory declaratory relief under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, against all Defendants, I (1) deny Atkins's motion for summary judgment, (2) grant in

---

[1]   Plaintiff styles his opposition as a "Motion to Dismiss Defendants' Motion or Motion for Summary Judgement." Defendants have neither filed a reply with regard to their motion nor responded to any of Plaintiff's motions. The time for doing so has passed. *See* Loc. R. 105.2(a). A hearing is not necessary. *See* Loc. R. 105.6. The motions are ready for resolution.

part and deny in part Defendants' motion to dismiss or, in the alternative, motion for summary judgment, treated as a motion for summary judgment, and (3) deny Atkins's request for entry of default. [2] I will also grant Atkins's motions to appoint counsel and schedule further proceedings in this case.

## Procedural History

This 42 U.S.C. § 1983 complaint for declaratory relief and compensatory, punitive and nominal damages was received for filing on October 22, 2014. ECF No. 1. Plaintiff Raymond Atkins states that when originally incarcerated in 2004 he officially designated his religion as a Christian under "Church of God in Christ" ("Church of God"). He claims, however, that later in 2009 he "began studying the teachings and traditions of the Jewish religion" and while confined at the Maryland Correctional Institution in Hagerstown, he received a kosher diet card. Atkins asserts that upon his transfer to the Eastern Correctional Institution ("Eastern"), his diet card "was confiscated upon his request for a kosher diet." [3] *Id.*

Atkins claims that in January of 2013, Chaplain Hancock advised him to "submit a religious change preference affiliation form, because his records showed him still being listed as [a member of the Church of God]." *Id.* He contends that he "filed the religious preference change form with Chaplain Hancock's office" and the changeover was completed in February of 2013. Atkins alleges that in May of 2013, he again requested a kosher diet and was given religious diet agreement/information forms, which he returned to the Chaplain's office. He

---

[2]     On March 11, 2015, Atkins filed a "declaration for entry of default." ECF No. 21. He claims that defendants failed to file a timely response. Defendants' dispositive motion was filed in a timely manner. Therefore, the default request will be denied.

[3]     He alleges that he was first denied a kosher diet by defendant Hancock in January of 2012, and the diet was subsequently denied by the Warden and Commissioner of the Division of Correction ("Division"). ECF No. 1.

complains that his "religious diet agreement was rejected by the Chaplain on July 3, 2013," and he filed grievances to the Inmate Grievance Office ("Grievance Office"). Atkins claims that in April of 2014 an administrative law judge ("ALJ") granted his grievance in part and recommended that the Division of Correction consider his eligibility for a kosher diet. He alleges that after resubmitting another application to the Chaplain, he was placed on the kosher diet on September 1, 2014. Atkins complains that his right to exercise his religion was denied and that his Fourteenth Amendment rights to due process were violated when he was continuously denied a kosher diet for a 29-month period. *Id.*

In his supplemental complaint Atkins contends that on October 30, 2014, he was moved to the west side compound of Eastern, where he was unable to receive a kosher diet for nineteen days, forcing him to go without food for three days and to "modify his diet for the remaining time spent on the west side." Supplemental Compl., ECF No. 14. He claims that, when he returned to the east side compound at Eastern, his kosher diet was "cold or served without the main course." *Id.*

## Standard of Review

Because matters outside the pleadings will be considered, defendants' motion will be treated as a motion for summary judgment. Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

3

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The "party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In *Anderson*, the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

4

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an "essential element" of his or her case as to which he or she would have the burden of proof. *See Celotex Corp.*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Analysis

There is no dispute that prior to his transfer to Eastern on August 19, 2011, Atkins had been receiving a kosher diet. Defendants state, through the declaration of Chaplain Hancock, that "an inmate may change his religious preferences bimonthly using a religious preferences registration form. The change becomes effective the first week of odd numbered months." Hancock Decl., ECF No. 18-2. Defendants state that on August 23, 2011, Atkins signed for his receipt of Eastern's orientation handbook, which describes the requirements regarding religious preference change requests. Switalski Decl., ECF No. 18-1. They state that a kosher diet "is available to inmates who have designated their religious faith as Jewish or as another recognized faith group that has the same basic tenets that require a kosher diet." ECF No. 18-2. In addition, "a lacto-ovo vegetarian diet is also available at [Eastern]" for inmates who register to receive that diet. Defendants claim that an inmate must

> request approval to participate in the Religious Diet Program . . . by completing a request form and submitting the completed request form to the administrative chaplain or his designee. If a request for [Religions Diet Program] participation is approved, a copy of the approved request is forwarded to the correctional food service manager and the completed paperwork is forwarded to Case Management to be included in the inmate's base file.

5

*Id.*

Defendants state, through the declaration of Eastern's Dietary Department Manager, that "[i]t is the policy of the [Division] to afford Jewish inmates the opportunity to exercise their religious beliefs to the fullest extent possible consistent with institutional security and budgetary constraints." White Decl., ECF No. 18-3. They note that the kosher meal is more costly than a regular meal due, in part, to the requirement that it be prepared in a "blessed area." *Id.*

Defendants state that at the time of Atkins's 2011 transfer to Eastern, his religious preference was registered as a Christian,[4] and his possession of a kosher meal card "was not a proper method of registering for kosher meals or declaring his faith as Jewish." ECF No. 18-2. Hancock states that on July 26, 2012, he was informed by another Eastern Chaplain that Atkins wanted to be on a kosher diet. Hancock states that he sent Atkins a letter explaining that a request for a kosher diet was set up for the Jewish faith group and as he was registered as a Christian with a prior history of Christian-group affiliations, none of which were Jewish, he did not qualify for the kosher diet. Hancock states he informed Atkins that "if he wanted to receive a kosher diet for health reasons, he could contact the Medical Department for a list of various diets to help with certain conditions." ECF No. 18-2. Hancock asserts that on August 2, 2012, he received "a request slip from Atkins complaining that he was not on a kosher diet 'after being at [Eastern] for almost a year.'" The chaplain states, however, that according to Department of Public Safety and Correctional Services ("Department") records, Atkins was still listed as a Christian. *Id.*

On February 25, 2013, Hancock received a request from Atkins to change his religious preference to Judaism." *Id.* Hancock sent the registration form to Atkins and two days later

---

[4]        While assigned to the Maryland Correctional Training Center in August of 2010, Atkins was signed up for the Master Cycle Menu. ECF No. 18-1.

Atkins signed it to change his religious preference to Judaism. ECF No. 18-1. Hancock noted that the change would take place in March of 2013. ECF No. 18-2. On May 13, 2014, Hancock received an email from Eastern staff stating that Atkins wanted kosher meals. In response, Hancock sent Atkins an application for the Religious Diet Program with instructions to complete it and to send it to the Chaplain's office. On June 3, 2013, Hancock received an application for Atkins's religious diet. *Id.*

Hancock acknowledges, however that on July 3, 2013, after communicating with Department representative Rabbi Axelrod, he informed Atkins that "he was ineligible for the kosher platform since he was not converted to the Jewish faith prior to incarceration and/or he was not born of a Jewish mother." Hancock states that after receiving the proposed July 2, 2014, Grievance Office decision and order finding Atkins's grievance "meritorious in part," he and Department representative Rabbi Tobesman, who replaced Rabbi Axelrod, met with Atkins and gave him a revised diet application to complete. On July 15, 2014, the completed application was faxed to Rabbi Tobesman, and on July 31, 2014, Atkins was approved to receive kosher meals. *Id.*

Defendants state that around that same time, on July 28, 2014, Atkins was sanctioned with a 120-day segregation term for violating Division rules, and when he came off of disciplinary segregation on October 30, 2014, the only beds available were on the Eastern west compound. ECF No. 18-3, ECF No. 18-4, and ECF No. 18-5. The following day, Hancock sent out a memo "removing Atkins from the kosher meal platform because a kosher kitchen is not available on the West Compound," ECF No. 18-2, and sent an email to an Eastern staffer that Atkins needed to go back to the east compound or be transferred to another institution to receive

his kosher diet.[5] ECF No. 18-6. Switalski observed that while housed on the west compound (where he remained until November 17, 2014), Atkins could purchase kosher items from the commissary. ECF No. 18-1. Atkins did in fact purchase items from the commissary that were not kosher approved meal items. ECF No. 18-1 and ECF No. 18-7. After Atkins's transfer back to the east compound, Hancock issued a memo placing Atkins back on the kosher diet. ECF No. 18-2. Defendants state that since that time, Atkins has received his kosher meals, seven days a week. ECF No. 18-1. Defendants argue that all meals served at Eastern require uniform portions in accordance with the approved menu, that the main course is served with all meal plans, and meals delivered to Atkins include hot meals. *Id.*

Defendants contend that Atkins filed an administrative remedy procedure grievance regarding his kosher meals, but it was dismissed as untimely. ECF No. 18-9. Atkins appealed that decision to the Grievance Office, which was administratively dismissed after Atkins failed to provide "substantiating documentation" previously requested by the office. Oakley Decl., ECF No. 18-10. A subsequent proceeding was dismissed by the Circuit Court for Somerset County. *Id.* Atkins filed another grievance regarding not receiving a kosher diet in March of 2013. ECF No. 18-11. Defendants state that he withdrew it in May of 2013. *Id.*

On June 20, 2013, Atkins filed another grievance complaining that he had not received his kosher diet. ECF No. 18-12 at 5. It was dismissed because "[a]ccording to [Department] requirements changing to Judaism from another religion for the purpose of receiving kosher meals does not qualify an inmate as eligible for the Religious Diet Program." *Id.* at 10. Atkins filed an appeal with the Commissioner of the Division, who dismissed the appeal. *Id.* at 4. An

---

[5] White states that the west compound does not have a blessed food preparation area as well as inmate workers who have been trained to prepare kosher meals. ECF No. 18-3. Switalski asserts that serving kosher meals is not possible on the west compound of Eastern because it is separate from the east compound where the kosher kitchen is located. ECF No. 18-1.

appeal was filed and referred to the Office of Administrative Hearings and was heard before an ALJ on January 14, 2014.  ECF No. 18-13 at 2.  The ALJ issued a decision on April 1, 2014, which granted Atkins's grievance in part and recommended that the Division consider Atkins's eligibility for a kosher diet pursuant to the Emergency Directive, "balancing the Grievant's sincere desire to fully participate in Judaism, including the dietary requirements, with the valid penological interests of the institution."  ECF No. 18-13 at 16.  The ALJ's decision was affirmed by the Secretary of the Department.  ECF No. 18-10.

The Executive Director for the Grievance Office states that Atkins has filed seven grievances with the office, and the one concerning his kosher diet, filed on September 25, 2013, was referred for a hearing.  *Id.*  On November 10, 2014, Atkins filed a grievance regarding his transfer to the west compound of Eastern and his inability to obtain a kosher diet.  ECF No. 18-6. Defendants state that Atkins did not file a grievance as to his denial of the kosher diet while housed on the west compound.  *See* ECF No. 18-10.

In his verified opposition, Atkins claims that his "identification as Christian upon his admission to prison in 2004 did not make his later Jewish beliefs insincere."  ECF No. 22.  He claims that prison officials denied him his right to a kosher diet and seemingly claims that defendant Hancock's decision to deny him a kosher diet after he had submitted the religious preference and dietary request deprived him of exercising his sincere religious beliefs under the First Amendment.  He further claims that, after he filed this action, he attempted to appeal the Warden's denial of his grievance (denial of kosher diet in October and November 2014) to the Commissioner but did not receive a response.  Atkins further alleges that Warden Green personally participated in the denial of his kosher diet as she is the "overseer" at Eastern, denied his grievance, and had knowledge of the violation of his rights.

9

Threshold Considerations under 42 U.S.C. § 1983

Defendants assert that the Division is not a person within the meaning of 42 U.S.C. § 1983 and the State of Maryland has not waived its sovereign immunity under the Eleventh Amendment. They are correct. The Division is a state agency of the Maryland Department. *See* Md. Code. Ann., Corr. Servs., Art., §§ 1-101(g) and 3-201. Neither a state nor an agency of a state is a "person" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64-65, 70-71 (1989). Moreover, state agencies are immune from liability under the Eleventh Amendment "from a [§ 1983] suit in federal court without regard to the nature of the relief sought." *C.H. v. Oliva*, 226 F.3d 198, 201 (3rd Cir. 2000); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). Consequently, the complaint against Division is subject to dismissal for want of jurisdiction.

Atkins also has failed to show how Warden Green personally participated in violating his constitutional rights under color of the law. Under § 1983, individual liability must be based on personal conduct. *See Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal,* 118 F.3d 1416, 1423-24 (10th Cir. 1997). Absent subjective knowledge, a prison official is not liable. *Farmer v. Brennan,* 511 U.S. 825, 846 (1994); *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998). The mere fact that Green denied Atkins's grievance does not alone impose liability. *See Whitington v. Ortiz,* 307 Fed. Appx. 179, 193 (10th Cir. 2009) (unpublished); *Larson v. Meek,* 240 Fed. Appx. 777, 780 (10th Cir. 2007) (unpublished).

Under *Shaw v. Stroud,* 13 F.3d 791 (4th Cir. 1994), supervisory liability may attach to a prison administrator under § 1983 if a plaintiff can establish three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of

10

constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (citations omitted). Under the first prong of *Shaw,* the conduct of the supervisor's subordinates must be "pervasive and unreasonable," meaning that the "conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* In establishing "deliberate indifference" under *Shaw's* second prong, a plaintiff "[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot . . . reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (quoting *Slakan v. Porter,* 737 F.2d 368, 372-73 (4th Cir. 1984)). Deliberate indifference, however, may be satisfied by showing "a supervisor's continued inaction in the face of documented widespread abuses." *Id.* Atkins has not made such a showing of supervisory liability here.

Defendants also assert that Atkins's claims must be dismissed due to his failure to "properly" exhaust available administrative remedies. The Prisoner Litigation Reform Act ("PLRA") provides, in pertinent part:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e. The Supreme Court has interpreted the language of this provision broadly, "hold[ing] that the PLRA's exhaustion requirement applies to all inmate suits about prison life,

11

whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Thus, the exhaustion provision plainly extends to Atkins's allegations. His complaint must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or "that defendants have forfeited their right to raise non-exhaustion as a defense." *See Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003).

The PLRA's exhaustion requirement is designed so that "prisoners pursue administrative grievances until they receive a final denial of their claims, appealing through all available stages in the administrative process." *Chase*, 286 F. Supp. 2d at 530; *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review in state court).

In Maryland, filing a request for administrative remedy with the Warden of the prison where an inmate is incarcerated is the first of three steps in the Administrative Remedy Procedure process provided by the Division to its prisoners. If this request is denied, the prisoner has thirty calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Executive Director of the Grievance Office. *See* Md. Code Ann. Corr. Serv. §§ 10-206, 10-210 and Code of Maryland Regulations, Title 12 § 07.01.05; *see also* Maryland Division of Corrections Directive 185-002,

12

§ VI.N I.

Administrative remedies must, however, be available to the prisoner, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *see also Blake v. Ross*, 787 F.3d 693, 700-01 (4th Cir. 2015) (finding inmate's belief that he exhausted administrative remedies was a reasonable interpretation of investigative and grievance procedures).

The record shows that Atkins exhausted his original claims regarding the denial of his kosher diet but did not complete the grievance process before filing his supplemental complaint as to his claim that he was denied his kosher diet for seventeen days in 2014. A prisoner must complete the administrative review process in accordance with applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court. *See Woodford,* 548 U.S. at 88; *Johnson v. Jones,* 340 F.3d 624, 628 (8th Cir. 2003) (finding dismissal is required under § 1997e(a) if an inmate has failed to exhaust all available administrative remedies *prior* to filing suit). Therefore, Atkins's claims regarding the denial of his kosher diet while at the west

13

compound is unexhausted and is dismissed.

Constitutional Claim

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). That retained right is not unfettered. Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the constitution. *See Turner v. Safely*, 482 U.S. 78, 89-91 (1987). The test to determine if the restrictions are justified requires examination of whether or not there is a rational relation between the asserted governmental interest and the regulation in question. In addition, this court must examine: whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive. *See Jehovah v. Clarke*, --- F.3d ---, 2015 WL 4734716 (4th Cir. July 9, 2015, amended Aug. 11, 2015) (applying *Turner* factors to evaluate prisoner's claim that authorities violated his free exercise rights under the First Amendment).

"The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices." *Morrison v. Garraghty,* 239 F.3d 648, 656 (4th Cir. 2001). This encompasses policies that impose a substantial burden on a prisoner's right to practice his religion. *Lovelace v. Lee,* 472 F.3d 174, 198 & n.8 (4th Cir. 2006). Under the Free Exercise Clause a prisoner has a clearly established right to a diet consistent with his religious

principles. *Wall v. Wade*, 741 F.3d 492, 498-500 (4th Cir. 2014).

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act ("Act").  The act provides in part that:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a) (2000).

A "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Lovelace*, 472 F.3d at 187 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)), or one that forces a person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand," *Id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).  The Fourth Circuit concluded that "for purposes of [the Act], a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his religious beliefs.'"  *Id.* (quoting *Thomas*, 450 U.S. at 718).

Atkins may not, however, seek damages under the Act. Congress has not authorized damages claims against state officials under it. *See Wall,* 741 F.3d at 496 n.5; *see also Sossamon v. Texas,* 563 U.S. 277, 131 S. Ct. 1651, 1658–1659 (2011) (prohibiting damages claims against state officials in their official capacity under the Act); *Selby v. Caruso,* 734 F.3d 554, 561 (6th Cir. 2013) (plaintiff could not state a claim against State for damages under the Act);

*Wrendelman v. Rouse,* 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity); *McCreary v. Richardson,* 738 F.3d 651, 655 (5th Cir. 2013) (finding "inmate is not entitled to monetary damages under [the Act] for a suit against correctional officer in his individual capacity"); *Easterling v. Pollard,* 528 Fed. Appx. 653, 656 (7th Cir. July 22, 2013) (same); *Maloney v. Ryan*, No. 03–314, 2014 WL 1230432, at *5 n.3 (D. Ariz. Mar. 25, 2014) (discussing that Fourth, Fifth, Seventh and Eleventh Circuit have held that individuals cannot be liable for damages under the Act). Therefore, defendants are entitled to summary judgment to the extent Atkins is seeking monetary damages under the Act. Atkins's claim for declaratory relief against defendants will proceed.

In addition, Atkins's § 1983 claim against Chaplain Hancock will proceed. Plainly, there is a material dispute as to whether Hancock's decision to deny Atkins a kosher diet in June of 2013, after Atkins had complied with policy requirements by submitting the required forms to register his religious preference as Judaism and to apply for a kosher diet plan under the Religious Diet Program, constituted arbitrary and capricious behavior which violated the First Amendment.

### Conclusion

For the above reasons, defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment, will be granted in part and denied in part. Atkins's claim for declaratory relief against defendants will proceed. His § 1983 claim will proceed against defendant Hancock. Atkins's motions for appointment of counsel will be granted. A separate Order follows.

Date: August 24, 2015                      /S/
                                    Paul W. Grimm
                                    United States District Judge